1
2
3
4
5
6
7                          UNITED STATES DISTRICT COURT

8                      FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    MELVIN DERELL BALDWIN-GREEN,              No.  2:20-cv-1329-DAD-SCR

11                    Petitioner,

12          v.                                  FINDINGS AND RECOMMENDATIONS

13    PATRICK COVELLO,

14                    Respondent.

15

16          Petitioner is a state prisoner representing himself in this habeas corpus action filed

17    pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2016 conviction from Shasta County

18    Superior Court on numerous felony counts for sex trafficking seven different victims, including

19    minors.  Upon consideration of the record and the applicable law, the undersigned recommends

20    denying petitioner's habeas corpus application on the merits.

21          **I.      Factual and Procedural History**

22          Petitioner does not contest the state courts' recitation of facts nor the sufficiency of the

23    evidence supporting any of the counts for which he was convicted.  Therefore, the undersigned

24    presumes that the California Court of Appeal's summary of the evidence is accurate and

25    reproduces it here.[1]

26                          **Crimes Committed Against C.**

27    _____

[1] See 28 U.S.C. § 2254(e)(1) (emphasizing that "a determination of a factual issue made by a

28    State court shall be presumed to be correct" unless the petitioner rebuts it by clear and convincing
      evidence).

                                                1

In November 2012, C. worked as a prostitute in Sacramento. She was 18 years old. Her pimp at the time, Kevin, had her walking a stretch of road in North Highlands referred to as "the blade." [….] Kevin rented a room at a nearby Motel 6 while C. worked.

In the middle of the month, Kevin introduced C. to Baldwin-Green, who went by the nickname, "Scooby." Baldwin-Green picked both up at the Motel 6 in his white Lexus sedan and brought them to his apartment off of Edison Avenue in the Arden-Arcade area. Williams was also at the apartment.[2] While Baldwin-Green and Kevin talked in the living room, Williams and C. got to know each other in the bedroom.  Williams told C. she was dating Baldwin-Green. At some point during the visit, Kevin and C. went outside together and Kevin became verbally and physically abusive. C. was crying when she returned to Williams in the bedroom. Williams held her, saying, "everything is going to be okay" and "you shouldn't be with somebody like that." C. also met another girl at the apartment, Ad., who was working as a prostitute for Baldwin-Green. C. asked Williams whether she could also work for him. Williams said she would talk it over with Baldwin-Green. About two days later, C. ran away from Kevin and started working for Baldwin-Green.

Defendants posted an online advertisement for C.'s services using photographs of her wearing lingerie supplied by Baldwin-Green. Williams took the photographs. Calls for C.'s services came to Baldwin-Green's cell phone. He often took these calls, changing "his voice to a girl's voice" while speaking to the potential clients. After a "date" was arranged, either Williams or Baldwin-Green would tell C. what services to provide and how much to charge. Williams would then do C.'s hair and makeup and lay out an outfit. Sometimes the date would involve just her providing the services. Other times, she and Ad. would provide them together. Either way, C. was required to collect the money up front and hand it over to Williams or Baldwin-Green at the end of the date.  Baldwin-Green would stay in the apartment during the dates, hiding in a closet or behind the couch, in order to protect the girls "if anything bad happens."

In addition to these "in-calls," defendants would also arrange "out-calls" for C., in which they would drive her to the client's location and wait for her in the car. During one of these out-calls, C. did not collect the money up front and the client refused to pay afterwards, saying: "You know I'm a pimp, right?" When C. returned to the car without the money, Baldwin-Green drove her back to the apartment and starting yelling about how "stupid" and "dumb" she was. He then called the "trick-slash-pimp" on the phone, telling him, "if you want her, you can come get her." After hanging up the phone, he called C. a "stupid bitch." In response, C. said she was leaving. Baldwin-Green pulled out a handgun and pointed it at her, saying: "No, you're not going anywhere." C. was scared and started crying. This was the first time Baldwin-Green had become violent with her and the first time she had seen him with a gun.

---

[2]  "Williams" refers to petitioner's codefendant, Tanishia Savannah Williams, with whom he was jointly tried.

2

Defendants brought C. up to Redding on three occasions between November 2012 and January 2013. Each time, they stayed at Baldwin-Green's mother's house for a few days. During the first trip, C. performed several out-calls. Williams and her sister, who also joined them for the trip, would get C. ready for the dates and drive her to the client's location. Sometimes, Baldwin-Green's mother would come along.

After this trip to Redding, back in Sacramento, C. was at a store with defendants when a friend of C.'s cousin started talking to her. This individual got into an argument with Baldwin-Green. They eventually took the argument outside to the parking lot, where Baldwin-Green got his gun out of the trunk of his car and threatened to start shooting. The cousin's friend walked away. Baldwin-Green then drove Williams and C. back to the apartment and drove off by himself. Later that night, he called Williams and said C.'s cousin had chased him on the freeway and shot at his car.

Baldwin-Green came back to the apartment the next morning and drove Williams and C. back to his mother's house in Redding. Apparently during the drive, C.'s cousin called Baldwin-Green. The conversation became heated. Baldwin-Green threatened to kill the cousin as well as "his sister, his son and whoever else that was in the way." C. started crying and asked to be taken home, but Baldwin-Green ignored her while Williams told C. her family did not care about her. When they got to the house in Redding, C. called her sister on the phone, but Baldwin-Green took her cell phone, saying, "he didn't want nobody to know where [she] was at." At some point, defendants drove C. back to the apartment in Sacramento. C. did not attempt to leave when they got back because in the meantime defendants "would say stuff to make [her] not want to go home," specifically, that her family did not want her and that defendants were her family and the only ones who cared about her.

The third trip to Redding occurred in January 2013 and included both C. and Ad. [Footnote omitted.] Both girls performed out-calls during the trip. When they returned to Sacramento, C. and Ad. decided to leave together. They waited until Baldwin-Green was not at the apartment and Williams was asleep. When Williams woke up as they were leaving, she asked where they were going. Ad. said they were going to her sister's house to babysit. Williams asked whether they asked Baldwin-Green. They said no. Williams then blocked their path to the front door and said she was going to call him. C. pushed Williams out of the way and ran out of the apartment. Ad. followed her out the door.

C. continued working as a prostitute in Sacramento after leaving defendants. About a month after leaving, she received a phone call from a man asking for a "car date," meaning she would provide the services in his car. The caller told her to meet him at a nearby gas station. When she arrived, the caller was in a Lexus that looked like Baldwin-Green's car except it had tinted windows and she did not remember his car having tinted windows. So she got inside. When the driver pulled out of the gas station and parked the car behind some nearby houses, Baldwin-Green opened the passenger side door

3

and began hitting C. in the head. C. kicked him and tried to get away, but Baldwin-Green grabbed her by the leg, forced her into the back seat, and got in beside her, continuing to hit her in the head. Williams and another woman also got in the back seat. At Baldwin-Green's direction, Williams held C.'s head down. Baldwin-Green then got in the front passenger seat and the car drove away. A short time later, the car stopped and Baldwin-Green paid the driver, who got out of the car and left.

Williams then took over the driving and Baldwin-Green returned to the back seat. He told C. she owed him $1,300 for damage done to his car when her cousin shot at him on the freeway. He said he was going to take her "to the woods" where he would "cut off all of [her] hair and . . . take all of [her] teeth out." He also threatened to find a cold mountain and "leave [her] there naked . . . to die." Baldwin-Green held C.'s head down and covered her face with a bandana while he threatened her, but she could feel a crescent wrench tightening around her fingers as he threatened to cut them off. C. was "crying and shaking" and told him she wanted to go home. He said she could not leave because she owed him money. C. understood this to mean she would be required to go back to work for him as a prostitute. After a long drive, Williams stopped the car at a motel in Red Bluff and paid for a room. Baldwin-Green escorted C. to that room holding her arm with one hand and a hammer with the other. Inside the room, he asked C. whether she "was going to make his money." C. said no and repeatedly asked to go home. After some yelling and arguing, including Williams telling C. to "just give him his money," Baldwin-Green said he would take her home the following morning.

The next morning, Williams tried to convince C. to pay Baldwin-Green back by working for them as a prostitute. She again refused and asked to go home. Baldwin-Green said he would take her home and they all got back in the car. After some driving around, at Baldwin-Green's direction, Williams stopped the car at a Walgreens and bought scissors. Back on the road, Baldwin-Green called someone on the phone and said he was going to leave C. in the mountains, adding, "why should I care if she dies out there, she didn't care about my safety." They ultimately pulled over in "the woods" north of Red Bluff. Baldwin-Green put on a ski mask and told Williams to use her cell phone to record a video. While she recorded, Baldwin-Green said, "this is what we do to bitches that . . . didn't care that we was nice." He then cut off C.'s hair, forced her to take off her clothes, and left her on the side of the road naked.

C. walked down the road for awhile and eventually came upon a house that was separated from the main road by a long dirt driveway. Two of the house's occupants, a mother and her daughter, were home at the time. The daughter was the first to notice C. in front of the house, "trying to cover herself" with her arms and hands and looking "nervous and stressed." Alerted to C.'s presence, the mother opened the front door and said: "Oh, my goodness. What is going on? Are you all right?" C. said, "her exboyfriend had cut off all of her hair and that she didn't know where she was." As they spoke, defendant's car drove partway down the driveway and quickly turned around and

left again. The mother brought C. inside and called 911 while her daughter gave C. some clothes to wear. A Tehama County Sheriff's deputy arrived a short time later. C. was taken to the hospital.

Later the same day, the mother called 911 again, this time to report a different white car was driving around the neighborhood. The same deputy returned and detained three people in a white Chevy Impala, i.e., Williams, and Baldwin-Green's mother and sister. Baldwin-Green apparently drove his white Lexus to a gas station outside Redding and left it there. The car was found by Shasta County Sheriff's deputies later that night and impounded. The ski mask, crescent wrench, and hammer described by C. were found in the vehicle. The car also had what appeared to be a bullet hole in the radiator.

....

### Crimes Committed Against G.

G. met Baldwin-Green in June 2013. By this point, Baldwin-Green was living at an apartment on Cottage Way across from Howe Community Park in the Arden-Arcade area. G. was 17 years old and also lived in the area. She would periodically walk past Baldwin-Green on her way home from school. Baldwin-Green would be standing next to his car parked on the street and would flirt with G. as she walked past. After a number of these encounters, Baldwin-Green gave G. a business card that simply read, "Scooby" and had a phone number. During a subsequent encounter, he asked whether she had a job or was looking for one. G. said she was looking. Baldwin-Green "kind of shrugged" in response. During another encounter, he showed her "a big wad of cash" that he had in his pocket and told her he had a business that "makes a lot of money." He also pointed out which apartment he lived in and told her she could come over if she ever wanted to "just hang out or talk."

G. thought Baldwin-Green was probably a drug dealer, but also that he was "pretty nice, like friendly," and they could be friends. At some point, G. took him up on his invitation to come over. When she knocked on his door, another girl looked out the window but did not open the door. G. left. On a different day, she ran into Baldwin-Green again and he invited her inside. G. had gotten into a fight with her mother and did not want to return home, so she followed him into his apartment. Inside the apartment, G. met the girl who had previously looked out the window when she first knocked on Baldwin-Green's door. This girl, K., offered G. some marijuana. The two smoked together and became friends. G. also met Williams, whom Baldwin-Green introduced as his cousin.

G. stayed at the apartment for about a week and a half. About two days after she arrived, Baldwin-Green told G. she should think about working as a prostitute if she wanted to make money. G. was "shocked," but the way Baldwin-Green broached the subject indicated "it was no big deal." She said nothing in response. Later, K. brought up the subject of prostitution in the apartment complex's pool. G. did not agree to become a prostitute during this conversation

5

either. After the conversation, she and K. went back into the apartment and smoked marijuana. Despite the lack of agreement on G.'s part, Williams later told her "a guy was going to come" to the apartment and she "had to stay" while everyone else left. G. understood this to mean the man was coming there to have sex with her. Williams confirmed this when she said the man "knew the price" and told G. to collect the money first. Rather than protest, G. decided to try to leave after defendants left and before the client showed up.

The client arrived before G. could leave the apartment. K., who was also still in the apartment when he got there, told him to come in and then left as the man handed G. the money. G. offered to return the money rather than have sex with him, but he said he did not want his money back and she "had to give him what he paid for." The man then forced G. to have sex with him on the floor. Defendants and K. returned shortly after the man left. Baldwin-Green demanded the money G. was paid. G. initially looked at K., who told her to "give it to him." G. complied and handed over the money.

Williams scheduled one more in-call for G. at the apartment, but she refused to have sex with the client and did not receive any money. An out-call was also scheduled. Baldwin-Green drove her to the client's house and dropped her off, but G. refused to go through a gate leading to the house by herself and returned to the car saying, "it looked sketchy." Baldwin-Green said, "whatever" and drove her back to the apartment.

Defendants then decided to have G. and K. walk Watt Avenue together and perform car dates. Baldwin-Green warned G. to avoid "flashy" cars because other pimps would be out there. As G. explained his warning, "if a pimp saw me, then he would take me and abuse me and take everything that I have and practically leave me out for dead." Baldwin-Green also told G. that he would be watching her in case "a pimp tried to get [her] or something goes wrong." G. was too scared to try to run away. Over the span of a few days, G. performed several car dates and gave the money she made to Baldwin-Green, who was parked at a nearby Kentucky Fried Chicken. After one of the car dates, G. tried to keep some of the money for herself. Williams caught her with the money in her bra and told her to give it to Baldwin-Green "before he finds out." Her voice was "stern" and "cold" when she issued this directive. Nevertheless, G. continued to keep some of the money she made, explaining: "I feel like I'm being used, so whatever I'm doing, then I'm going to keep it. I'm going to keep half regardless, because I was going to leave."

About a week and a half after G. started working for defendants, she and K. decided to leave together, along with another girl who arrived at the apartment a day or two before. They waited until defendants left the apartment and ran to a nearby Starbucks together. The other girl, whom everyone called "the Kid," secured a ride to South Sacramento for the three of them.

In the meantime, G.'s mother was trying to find her daughter. G. had run away before, but always returned in a few days. Her mother

6

found a phone number for "Scooby" in G.'s backpack and called the number. A female answered the phone. After speaking to this female, G.'s mother unsuccessfully searched for her daughter at an apartment complex. She called the number again and eventually spoke to Baldwin-Green, who connected her, by way of a three-way call, to another female who was apparently with G. in South Sacramento. After several hang ups, this female agreed to drop G. off at a gas station near the Arden Fair Mall. Baldwin-Green offered to meet G.'s mother at the gas station "to make sure everything [was] fine." She agreed. G. was dropped off at the gas station as arranged. Baldwin-Green also came to the gas station, but stayed in his car. When G. met her mother at the gas station, she saw Baldwin-Green's car and became agitated. Police also arrived a short time later and arrested G. on a juvenile warrant.

G. was later interviewed by an investigator. G. stated during the interview that she told Baldwin-Green she was not going to work as a prostitute, to which he responded, "she did not have a choice" and "told her that he would hurt her mom if she refused."

….

**Crimes Committed Against S.**

S. met Baldwin-Green in December 2013. She was 18 years old and working as a prostitute in Vacaville. Baldwin-Green got her cell phone number from an online advertisement she had put up for herself. He sent her a text message with a picture of "stacks of money" attached. The text message told her she needed to choose a pimp and offered himself as that pimp. S. agreed to meet Baldwin-Green on Watt Avenue. He told her he would be arriving in a white sedan, but pulled up in a dark green car. S. got in the car and agreed to work for him. As she explained: "I had nowhere else to go. At the time, I was going from house to house homeless and [working for Baldwin-Green] was basically stable, safe shelter." Baldwin-Green then picked up Williams and the three drove to a one-bedroom apartment in Redding.

At the apartment, Baldwin-Green took photographs of S. in lingerie he provided, placed an online advertisement for her services, and also booked the dates. As S. described, he "sounded like a girl" when he talked to potential clients on the phone, adding, "he played it off smooth so they were thinking they were really talking to a female." S. performed several in-calls in the living room of the apartment during the month of December. She slept in the bedroom with Baldwin-Green. Williams would periodically stay the night at the apartment and slept on a futon. The second night S. was at the apartment, Baldwin-Green showed her he had a gun and some knives. While S. never attempted to leave the apartment, at least not until she successfully did so on December 31, she testified the doorknob on the bedroom door was "switched inside out" such that Baldwin-Green was able to lock it from the outside. On three or four occasions, he locked her in the bedroom. On two occasions, S. told Baldwin-Green she wanted to go back to Sacramento. He refused and said she "wasn't making enough money." S. had access to a cell

phone while she was at the apartment and used it periodically to call her mother, but testified she did not tell her what was going on because she believed her mother would have told her to "find a way home."

Baldwin-Green and S. had sex twice while she was at the apartment. The first night she was at the apartment, Baldwin-Green came into the bedroom and told her she would not be going home unless she had sex with him. S. did not want to do so, but complied without objection because she thought she "had to" in order to "make a little money and leave." They had sex again a couple days later. Baldwin-Green did not say anything beforehand. S. did not want to have sex with him this time either. When asked why she had sex with him again, S. testified: "Just did."

As mentioned, S. left the apartment on December 31. She was in the bathroom talking to her mother on the phone when defendants came in the bathroom and started arguing with her, apparently about the fact she was on the phone. Baldwin-Green took the cell phone and threw it on the floor, breaking it. The argument moved to the living room. Baldwin-Green told Williams to hit S. Instead, Williams grabbed S. and held her "between her arms" while Baldwin-Green called his mother, who showed up a short time later with two other people. When S. demanded to leave, Baldwin-Green's mother told her son: "Let her go." After some discussion between Baldwin-Green and his mother, someone opened the front door and S. walked out of the apartment.

S. ran across the street to a woman who was in her driveway putting her children in her car to go grocery shopping. S. was "screaming to call 911." The woman described S.'s demeanor as "really upset," adding: "She was crying. Her make-up was all over her face. Her hair was messed up. She was putting -- her shoes were under her arm." The woman called 911. During the call, Williams also came across the street and "was trying to convince [S.] that everything was fine and to come back with them." S. responded: "Get the fuck away from me." Williams returned to Baldwin-Green and the others, who were watching from across the street. Everyone got into a Chevy Impala and drove away. After some time waiting for law enforcement officers to arrive, the woman who made the 911 call drove S. to the police station herself.

….

**Crimes Committed Against T.**

T. was 16 years old and living in Sacramento when she met Baldwin-Green. They met through an online dating Website sometime toward the end of 2013. T. told Baldwin-Green her age, either while communicating through the Website or after exchanging phone numbers and communicating through text messages. They met in person two or three weeks later. As T. explained, based on their text message interactions, "he seemed like a really nice person and very peaceful to be around." When they met in person, Baldwin-Green also brought Williams. This first encounter involved sitting in

Baldwin-Green's car and "getting to know each other a little better." On another occasion, they arranged to meet at a party. Williams was there as well. The third in-person encounter involved defendants picking T. up at her house and driving her to Redding, to the same apartment S. stayed at, although apparently before S. arrived. [Footnote omitted.] T. stayed at the apartment for three days, sleeping in the living room. She kept to herself for the most part because Baldwin-Green's "presence and the way he was talking and moving around a whole lot made [her] feel uneasy." After three days, Baldwin-Green drove T. home.

Back in Sacramento, Baldwin-Green continued communicating with T., mainly through text messaging. T. told him she felt uneasy about being in Redding with him. He promised "next time it wouldn't be that way." T. decided to give him another chance. At some point, Baldwin-Green and Williams picked her up and drove her back to the same apartment in Redding. This time, T. stayed for only two days. When she told Baldwin-Green she wanted to go home, he became "angry and furious" and gave Williams money to buy her a bus ticket back to Sacramento. When T. got back to Sacramento the second time, she considered deleting Baldwin-Green's number from her phone, but decided to give him a final chance and resumed communication. After they talked some more, T. felt like she knew him "a little better" and agreed to make a third trip to Redding with him. Defendants again picked her up and drove her to the same apartment.

Defendants brought up the subject of prostitution after they got to the apartment. When T. said she was not comfortable doing that, Baldwin-Green "got mad and started cussing." T. again said she wanted to go home. Baldwin-Green responded, "[I] don't give a fuck," and told T. she "will be prostituting" and "would be staying out there for as long as he wants." T. then started "screaming and cussing" and tried to leave the apartment, but Baldwin-Green pulled her back inside and the two yelled at each other in the apartment, "screaming and cussing back and forth." Baldwin-Green told her, "you can try to leave all you want, but you will not get far out there" and "this is my city." T. tried to leave again, but he blocked her path to the door. After that, she "just gave up." Baldwin-Green brought up prostitution again after they had calmed down. T. repeated she would not be doing that. Baldwin-Green responded: "[T]hat is the only way you're going to get back home." He also showed her a video on his cell phone of "a girl getting beat up by a dude and everybody was just sitting there laughing, like it was all fun and games." T. recognized Baldwin-Green in the video, and, while she did not say whether he was the one delivering the blows, she understood the video to depict "what he did to girls before" and described it as "very terrifying." After watching the video, T. "gave in" and "went into prostitution."

Similar to his previous victims, Baldwin-Green took photographs of T. in lingerie, used them to place an online advertisement for her services, and also booked the dates, "disguis[ing] his voice as a girl" while talking to potential clients. Also like S., T. performed in-calls in the living room of the apartment, collecting the money up front

9

and handing it to Baldwin-Green after the date. Some of the sex acts were performed with another girl, possibly S. T. also had sex with Baldwin-Green twice at the apartment. She was still 16 years old.

According to T., Williams's role was "just helping [Baldwin-Green] out with all he needed," such as buying condoms and lubrication and picking up food. Williams was "friendly" to T. while she was at the apartment and at some point T. asked Williams to help her leave. Williams said that was not "in his hands" and it was instead "all up to [Baldwin-Green]." T. also tried to escape out of the bathroom window, but the window was too small. She did not try to leave through the front door because, as T. explained, Baldwin-Green "always had [Williams] there with me to make sure I don't go outside." And while defendants and T. periodically went out in public together, T. did not try to run away or call out for help because she was afraid Baldwin-Green would "do something stupid." When asked what she meant by "something stupid," T. answered: "He'll yell and actually hit me one time when he got mad because I didn't want to do a date." T. further testified Baldwin-Green bragged "that he got guns and that he know how to use them," which "scared the living hell out of [her]."

Defendants moved T. to a different apartment in Redding sometime after S. left. She continued to perform in-calls at this apartment. Baldwin-Green and T. also had sex a third time while staying there. When asked why she did not try to escape from this apartment, T. explained Baldwin-Green "had every door bolted and locked and he flipped the locks" so they could be locked from the outside. The windows also had "little bolts" preventing them from opening. T. saw Baldwin-Green installing these bolt locks. She tried to unscrew them at some point, but they were "too hard to unscrew."

T. escaped from the apartment in April 2014. Baldwin-Green "got mad" about something and "stormed out" of the apartment, forgetting to take her cell phone with him. Apparently, Williams was not at the apartment at this time. T. took this as her opportunity to leave. As she described: "I called my sister and I told her what happened and what he did to me and asked her to call 911. And that's when I called 911 and that's when I got my stuff and went out the house. And she told me go to the nearest neighbor to help you. You know, the next door neighbor, he was deaf so he couldn't help me so I ran to the next person that was able to help." That person was leaving her house to help her niece move into a different house down the street. T. ran up to the woman and asked to hide in her house. The woman described T.'s demeanor as "anxious, upset," with "tears in her eyes." Nevertheless, the woman declined to bring T. inside her house. Instead, she told T. to "go hide somewhere" and she would "get back to [her]" after helping her niece. She then walked to her niece's new house and told her what happened. The niece responded: "Auntie, you cannot leave that girl down there." The woman then went back outside and motioned for T. to come to the niece's house. T. quickly walked over to the house and went inside, where she told the niece what had happened. Officers with the Redding Police Department arrived a short time later.

….

**The Remaining Victims (Ad., Az., and K.)**

As previously mentioned, Ad. worked as a prostitute for defendants during roughly the same time period as C. She met Baldwin-Green while working a stretch of road known for prostitution in the South Sacramento area, Stockton Boulevard. She was 16 years old when she started working for defendants. At some point they discovered she was a minor and told her she had to leave. A short time later, however, they allowed her to come back to work for them so long as she interacted primarily with Williams and gave him the money she made. Defendants also brought her to Redding with C. on one occasion to perform out-calls while she was still a minor….

As also mentioned, K. worked as a prostitute for defendants during roughly the same time period as G. She met Baldwin-Green at a gas station on Watt Avenue. She was 16 years old and worked for defendants for two or three months, performing about 15 in-calls a week. During this time period, she also performed one out-call and several car dates….

Finally, Az. was working as a prostitute in Sacramento when she met Baldwin-Green in May 2014, after the events involving T. He contacted her through an online advertisement she had put up for herself and told her she could make more money working for him in Redding. Az. agreed and spent about a week at a house in Redding with Baldwin-Green and Williams. Az. performed four or five in-calls and one out-call. A second out-call was scheduled, but the purported client was an officer with the Redding Police Department, who booked the out-call as part of a sting operation conducted following T.'s escape, described above….

ECF No. 18-22 at 3-19.

Based on this evidence, the jury convicted petitioner of four counts of human trafficking of a minor; abduction of a minor for purposes of prostitution; three counts of pimping a minor; two counts of pandering a minor; child abuse; two counts of human trafficking of an adult; four counts of pimping; five counts of pandering; kidnapping; aggravated kidnapping; three counts of false imprisonment by violence or menace; forcible rape; statutory rape; attempted statutory rape; robbery; posing as a minor for commercial sex acts; and, making a criminal threat. See ECF No. 18-8 at 13-17(Abstract of Judgment). He was sentenced to serve a determinate term of 55 years in prison consecutive to an indeterminate term of 37 years to life. ECF No. 18-8 at 13-17.

////

////

11

1   **A.  Direct Appeal**

2       Petitioner appealed his conviction to the California Court of Appeal.  On April 19, 2019,

3   the Court of Appeal reversed his conviction for forcible rape and modified the sentence to a total

4   determinate term of forty years in prison to be served consecutively to his indeterminate sentence

5   of 37 years to life.  ECF No 18-22 at 66-67.  A petition for rehearing was denied by the California

6   Court of Appeal on April 29, 2019.  ECF No. 18-23.  The California Supreme Court denied his

7   petition for review on July 24, 2019.  ECF No. 18-27.

8   **B.  Federal Habeas Proceedings**

9       On June 2, 2020, petitioner filed a petition for writ of habeas corpus in this court.[3]  ECF

10  No. 1.  On July 8, 2020, the court dismissed the petition with leave to amend.  ECF No. 3.

11  Petitioner filed a first amended § 2254 petition that was served on respondent.  ECF Nos. 4, 7.

12  On October 2, 2020, respondent filed a partial motion to dismiss because claim four was

13  unexhausted.  ECF No. 10.

14      Before the court could rule on the pending motion to dismiss, petitioner filed a motion to

15  amend along with a proposed second amended § 2254 petition that removed the unexhausted

16  claim.  ECF Nos. 14-15.  On December 10, 2020, the court granted petitioner's motion to amend

17  and directed respondent to file an answer to the second amended § 2254 petition, which is the

18  operative pleading before the court.

19      The second amended § 2254 petition raises three claims for relief.  First, petitioner

20  contends that California Penal Code § 236.1(c)(2), human trafficking, as applied in counts 1 and

21  31, is unconstitutionally vague because it does not include a causation element or any nexus

22  between commercial sex acts and the element of force or fear.  ECF No. 15 at 5.  Next, petitioner

23  challenges his conviction on counts 13 and 26, asserting that his right to due process was violated

24  because the jury was not instructed that consent is a defense and that the prosecution must prove

25  the lack of consent to engage in prostitution.  ECF No. 15 at 7.  Finally, he alleges that his

26  sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.  ECF

27  _____

28  [3]  The filing date was calculated using the prison mailbox rule.  See <u>Houston v. Lack</u>, 487 U.S. 266 (1988).

1  No. 15 at 8.  All three of these claims were raised and rejected on direct appeal.  Since petitioner

2  does not present any significant argument in support of his habeas claims, the court liberally

3  construes his claims as coextensive with his federal constitutional claims raised and exhausted by

4  appellate counsel during direct appeal proceedings.  See Haines v. Kerner, 404 U.S. 519, 520–21

5  (1972) (per curiam); Peterson v. Lampert, 319 F.3d 1153, 1159 (9th Cir. 2003) (en banc),

6  (emphasizing that pro se pleadings are entitled to liberal construction).

7          Respondent filed an answer on December 17, 2020 and lodged the relevant state court

8  records.  ECF Nos. 18-19.  With respect to claim one, respondent contends that the

9          California Court of Appeal held an element [of forcible trafficking of a minor] is force as
10         'part' of, or as a 'necessary accompaniment' to, the trafficking.  That court reasonably
            rejected a theory that the Constitution required a further element—force actually causing a
11         victim to engage in sexual activity.

12  ECF No. 19 at 1.  Next, respondent contends that petitioner's Sixth Amendment right to a jury

13  trial was not violated because "the instructions [defining human trafficking of an adult] forced

14  jurors to find a circumstance that as a matter of law showed lack of consent as defined by state

15  law…."  ECF No. 19 at 7.  This determination of a state law question by a state court is not

16  subject to federal habeas review.  ECF No. 19 at 7 n. 1.  Additionally, the California Court of

17  Appeal's determination that any jury instructional error was harmless was reasonable and,

18  therefore, precludes federal habeas relief.  ECF No. 19 at 7.   Finally, respondent submits that the

19  Eighth Amendment challenge to petitioner's sentence is procedurally barred and is also frivolous

20  on the merits because there is no clearly established law finding that a sentence in excess of a

21  human lifespan is excessive when it constitutes the punishment for seventeen individually

22  punishable offenses involving seven different victims, including minors.  ECF No. 19 at 8 (citing

23  Norris v. Morgan, 622 F.3d 1276, 1293, 1294-95 (9th Cir. 2010)).

24          Petitioner did not file a traverse and the time to do so has expired.

25  **II.      AEDPA Standard of Review**

26          To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that

27  the state court decision resolving the claim on the merits "was contrary to, or involved an

28  unreasonable application of, clearly established Federal law, as determined by the Supreme Court

13

1    of the United States[.]"  28 U.S.C. § 2254(d)(1).  The "contrary to" and "unreasonable

2    application" clauses of § 2254(d)(1) are distinct, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts. The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular
> case. The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362
> (2000)], that an unreasonable application is different from an
> incorrect one.

10   Bell v. Cone, 535 U.S. 685, 694 (2002).

11        "A state court's determination that a claim lacks merit precludes federal habeas relief so

12   long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

13   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

14   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

15   state prisoner must show that the state court's ruling on the claim being presented in federal court

16   was so lacking in justification that there was an error well understood and comprehended in

17   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

18        The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

19   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

20   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

21   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

22   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

23   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

24   what law is "clearly established" and what constitutes "unreasonable application" of that law.

25   Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

26   1057 (9th Cir. 2004).

27        Relief is also available under the AEDPA where the state court predicates its adjudication

28   of a claim on an unreasonable factual determination.  28 U.S.C. § 2254(d)(2).  The statute

14

1   explicitly limits this inquiry to the evidence that was before the state court.  See also Cullen v.

2   Pinholster, 563 U.S. 170 (2011).  Under § 2254(d)(2), factual findings of a state court are

3   presumed to be correct subject only to a review of the record which demonstrates that the factual

4   finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

5   light of the evidence presented in the state court proceeding."  "[U]nreasonable" in § 2254(d)(2)

6   is interpreted in the same manner as that word as it appears in § 2254(d)(1) – i.e., the factual error

7   must be so apparent that "fairminded jurists" examining the same record could not abide by the

8   state court factual determination.  A petitioner must show clearly and convincingly that the

9   factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

10         If petitioner meets either of the § 2254(d) standards, then the federal habeas court reviews

11   the merits of the constitutional claim "by considering de novo the constitutional issues raised[,]"

12   i.e., without the deference AEDPA otherwise requires. Frantz v. Hazey, 533 F.3d 724 (9th Cir.

13   2008) (en banc).  However, in certain circumstances that "second inquiry" will not be necessary if

14   the court's holding on the § 2254(d) standard shows that the de novo constitutional standard "is

15   satisfied as well."  Id. at 736.

16         **III.    Analysis**

17         A federal habeas court looks to the last reasoned state court decision in applying the §

18   2254(d) standard.  Wilson v. Sellers, 584 U.S. 122 (2018) (adopting the Ylst look-through

19   presumption of silent state court denials of relief even after the decision in Harrington v. Richter,

20   562 U.S. 86 (2011)); see also Ylst v. Nunnemaker, 501 U.S. 797 (1991) (establishing the "look

21   through" doctrine in federal habeas cases).  In this case, the last reasoned state court decision

22   denying all three claims for relief is the California Court of Appeal's decision.  Thus, this court

23   "looks through" the subsequent silent denial by the California Supreme Court and reviews the

24   California Court of Appeal's decision for objective reasonableness under 28 U.S.C. § 2254(d).

25         **A. Vagueness Challenge to Aggravated Human Trafficking of a Minor**

26         In this claim, petitioner raises a facial and as-applied challenge to his convictions for the

27   aggravated human trafficking of a minor in Counts 1 and 31 because the victims "were persuaded

28   without the use of force; the force allegation arose later in their relationships with petitioner."

15

ECF No. 15 at 5. As argued on direct appeal, petitioner contends that because aggravated human trafficking "raises the offense level from a determinate term of five, eight, or twelve years to an indeterminate term of fifteen years to life[,]… fundamental due process requires that there be a certain test of causality and knowledge and intent which is stated in the statute and communicated to the jury and supported by substantial evidence." ECF No. 18-7 at 57. Essentially the statute's requirement that the offense "involves" one of the designated aggravating circumstances is too vague to withstand constitutional scrutiny. See ECF No. 18-20 at 13. Even as applied, petitioner argues that "[e]ven if force or duress was used concurrently with the human trafficking, it does not follow that it necessarily caused the victim to remain with [petitioner] and/or to participate in prostitution." ECF No. 18-7 at 58.

### 1. Last Reasoned State Court Opinion

We begin with the statutory language. Section 236.1, subdivision (c), makes it a crime to cause, induce, or persuade, or attempt to cause, induce or persuade, a minor to engage in a commercial sex act, with the specific intent to effect or maintain a violation of several listed offenses, including pimping and pandering. If "the offense," i.e., the defendant's act of causing, inducing, or persuading, or attempting to cause, induce, or persuade, a minor to engage in a commercial sex act with the requisite specific intent, "involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person," the aggravated form of the crime has been committed and the offense is punishable by a term of 15 years to life in prison. (§ 236.1, subd. (c)(2).) Thus, the statute requires the defendant's commission of the offense to "involve" one of the aggravating circumstances.

….

We conclude section 236.1, subdivision (c)(2), satisfies this reasonable certainty test. Indeed, Baldwin-Green does not dispute that an ordinary person of average intelligence would understand what it means to cause, induce, persuade, or attempt to cause, induce, or persuade, a minor to engage in a commercial sex act while possessing the specific intent to violate certain enumerated provisions, including those prohibiting the crimes of pimping and pandering. He does dispute that such a person would understand what it means for the crime to "involve" one of the aggravating conditions. However, as we have explained, this simply means the defendant's commission of the human trafficking crime included as a part of that crime, or necessarily entailed as an accompaniment thereto, the use of force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person. For example, where a defendant attempts to persuade a minor to work for him or her as a prostitute with the intent to pimp or pander that minor,

16

he or she has committed the crime of human trafficking of a minor. Where he or she uses force or fear or another of the aggravating tactics in his or her attempt to persuade, or that attempt at persuasion necessarily entails such force, fear, etc., he or she has committed the aggravated form of the crime. Nor does the statute provide insufficiently definite guidelines so as to impermissibly delegate basic policy matters to the police, judges and juries for resolution on a subjective basis.

Nevertheless, in asserting his facial vagueness challenge, Baldwin-Green relies primarily on *Johnson v. United States* (2015) ___ U.S. ___ [135 S.Ct. 2551] (Johnson).)

….

The only similarity between this case and *Johnson, supra,* ___ U.S. ___ [135 S.Ct. 2551] is the residual clause at issue there and section 236.1, subdivision (c)(2), at issue here both include the word "involves." But it was not the use of that word that rendered the residual clause unconstitutionally vague. Instead, it was the fact that the residual clause required an assessment of the ordinary case of whatever crime was at issue, *not the actual commission of that crime*, and a comparison of the amount of risk presented by that imagined ordinary case with the amount of risk presented by an imagined ordinary case of burglary, arson, extortion, or other crime involving the use of explosives, in order to determine whether or not the ordinary case of the crime at issue, again not the actual commission of that crime, involves conduct that presents a serious potential risk of physical injury to another. Here, by contrast, the crime of human trafficking of a minor is aggravated where the defendant uses force or fear or another of the aggravating tactics in order to cause, induce, persuade, or attempt to cause, induce, or persuade, a minor to engage in a commercial sex act with the requisite specific intent, or where his or her commission of the offense necessarily entails the use of such force, fear, etc. Thus, whether or not the crime "involves" one of the aggravating circumstances is determined by the "real-world facts" of the particular defendant's commission of the offense in a particular case. *Johnson, supra,* ___ U.S. ___ [135 S.Ct. 2551] is manifestly inapposite.

….

Section 236.1, subdivision (c), requires the defendant to have caused, induced, or persuaded, or attempted to cause, induce, or persuade, a minor to engage in a commercial sex act. Thus, the statute covers both the successful causing of the harm sought to be prevented and the unsuccessful attempt to cause such harm. As Witkin and Epstein point out with respect to an analogously structured statute (§ 136.1): "A person attempting any of the prohibited acts is guilty of the offense attempted without regard to the success or failure of the attempt." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Governmental Authority, § 6, p. 1425.) With respect to the intent requirement, the crime is a specific intent offense, requiring the specific intent to effect or maintain a violation of

several listed offenses, including pimping and pandering. (§ 236.1, subd. (c).)

Baldwin-Green does not appear to assert the foregoing definition of the crime unconstitutionally dispenses with either causation or intent. Instead, he argues the circumstance aggravating the crime must itself have caused the minor to engage in a commercial sex act, and further the defendant must have specifically intended that aggravating circumstance to cause the minor to do so. He cites no authority remotely supporting these assertions. Moreover, as we have explained, the mere attempt to cause, induce, or persuade a minor to engage in a commercial sex act with the requisite specific intent suffices to constitute the offense without regard to the success or failure of the attempt. This is so regardless of whether the non-aggravated or aggravated form of the crime is committed. What distinguishes the latter from the former is the use of force or fear or another of the aggravating tactics, or otherwise committing the crime in a manner that necessarily entails the use of such force, fear, etc. Baldwin-Green would have this court insert additional causation and intent requirements onto the aggravated form of the crime. We have uncovered no authority interpreting the Due Process Clause in such a way as would require us to do so.

Baldwin-Green further asserts section 236.1, subdivision (c)(2), is unconstitutional as applied in this case because, while the amended information read to the jury alleged Counts 1 and 31 were "committed by force, fear, [etc.]," and the jury was further instructed the prosecution was required to prove "the additional allegation that when the defendant committed those crimes, he/she used force, fear, [etc.]," these statements do not require one of the aggravating circumstances to have "caused the human trafficking to occur," as he claims is required to render the statute constitutional. We have already rejected Baldwin-Green's assertion that the Due Process Clause requires us to insert this additional causation requirement onto section 236.1, subdivision (c)(2). We must therefore reject his as-applied challenge as well.

ECF No. 18-22 at 21-27.

## 2. Clearly Established Federal Law

A criminal statute is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617 (1954). Nor can a state statute be so vague that it allows law enforcement to enforce it in an arbitrary and discriminatory manner. See Smith v. Goguen, 415 U.S. 566, 574-75 (1974). The Due Process Clause's "prohibition against

18

1   excessive vagueness does not invalidate every statute which a reviewing court believes could

2   have been drafted with greater precision." Rose v. Locke, 423 U.S. 48, 49 (1975).  Moreover,

3   "[t]he judgment of federal courts as to the vagueness or not of a state statute must be made in the

4   light of prior state constructions of the statute. ... When a state statute has been construed to forbid

5   identifiable conduct..., claims of impermissible vagueness must be judged in that light."

6   Wainwright v. Stone, 414 U.S. 21, 22 (1973) (per curiam) (citations omitted).

7       **3.  2254(d) Analysis**

8       The undersigned finds that the California Court of Appeal reasonably distinguished the

9   residual clause of the Armed Career Criminal Act, at issue in Johnson, 576 U.S. 591, from the

10  state aggravated human trafficking statute.  As a result, Johnson does not compel relief since the

11  state court decision was not contrary to nor an unreasonable application of this clearly established

12  federal law.  28 U.S.C. § 2254(d)(1).  Moreover, applying general due process standards, a person

13  of ordinary intelligence would understand that using "force, fear, fraud, deceit, coercion,

14  violence, duress, menace, or threat of unlawful injury" when causing, inducing, or persuading, or

15  attempting to cause, induce, or persuade a minor to engage in a commercial sex act would

16  constitute a criminal offense.  Any similar as-applied due process challenge also fails.  The

17  testimony of victims T. (count 1) and G. (count 31) included numerous examples of petitioner

18  using force, violence, or threats against them or a relative to convince them to go on "dates" that

19  he had arranged for them.  Even on direct appeal, petitioner acknowledged that "[f]orce or duress

20  may have occurred, but it may not have caused the human trafficking to occur."  ECF No. 18-17

21  at 58.  Petitioner's due process argument boils down to an attempt to require a specific causation

22  requirement as to an aggravating circumstance.  See ECF No. 18-17 at 57 (arguing that "the

23  prohibited conduct must at least be a substantial causative factor in creating the harm")

24  (Appellant's Opening Brief).  But petitioner points to no clearly established federal law making

25  that a constitutional requirement.  Moreover, this court, on federal habeas review, is proscribed

26  from acting as a state legislature and rewriting state law.  See Waddington v. Sarausad, 555 U.S.

27  179, 192 n. 5 (2009) (emphasizing that "it is not the province of a federal habeas court to

28  reexamine state-court determinations on state-law questions." (citation and quotation omitted)).

19

1    For all these reasons, petitioner is not entitled to habeas relief for claim one.

2          **B.  Due Process Challenge to Jury Instruction on Counts 13 and 26**

3          In his second claim for relief, petitioner asserts that his right to due process was violated

4    when the jury was not instructed that consent is a defense to human trafficking of an adult and

5    that the prosecution must prove the lack of consent.  See California Penal Code § 236.1(b)

6    (defining human trafficking of an adult).  Petitioner compares adult human trafficking to the

7    crime of false imprisonment, which requires lack of consent.  After reviewing petitioner's direct

8    appeal briefs, it appears that petitioner asserts that a jury instruction was required because lack of

9    consent was an element of the offense and that petitioner relied on the affirmative defense of

10   consent for both counts 13 and 26.  ECF No. 18-17 at 95.

11          **1.  Last Reasoned State Court Opinion**

12          The California Court of Appeal's decision denying relief is the last reasoned state court

13   opinion which this court reviews for objective reasonableness under 28 U.S.C. § 2254(d).  After

14   comparing the statute prohibiting adult human trafficking to the false imprisonment statute, the

15   California Court of Appeal ultimately denied relief, finding that any error in failing to instruct on

16   consent was harmless beyond a reasonable doubt.  ECF No. 18-22 at 45-49.

17          Nevertheless, we need not determine whether or not the jury should
18   have been specifically instructed with the consent language that
     appears in the false imprisonment instruction because even if the trial
19   court had a sua sponte duty to modify CALCRIM No. 1243 to
     provide this language to the jury, we conclude the error was
20   harmless. An instructional error that improperly describes or omits
     an element of an offense is harmless if it appears beyond a reasonable
21   doubt that the error did not contribute to the jury's verdict. [Citations
     omitted.] Here, the jury would have understood lack of consent to be
22   a requirement from the inclusion of "force, fear, fraud, deceit,
     coercion, violence, duress, menace, or threat of unlawful injury to the
23   victim or to another person under circumstances in which the person
     receiving or perceiving the threat reasonably believes that it is likely
24   that the person making the threat would carry it out" as examples of
     circumstances involving a "substantial and sustained restriction of
25   another person's liberty." (CALCRIM No. 1243.) Moreover, with
     respect to each victim, the jury also found Baldwin-Green guilty of
26   false imprisonment by violence or menace (Counts 18 and 30). As
     already indicated, with respect to this crime, the jury was specifically
27   instructed the prosecution was required to prove "[t]he defendant's
     act made [a] person stay or go somewhere against that person's will,"
28   and elaborated: "An act is done against a person's will if that person
     does not consent to the act. In order to consent, a person must act

                                            20

1    freely and voluntarily and know the nature of the act."

2    We conclude beyond a reasonable doubt the consent issue was
     resolved against Baldwin-Green and any assumed instructional error
3    was therefore harmless.

4    ECF No. 18-22 at 48-49.

5    ### 2. Clearly Established Federal Law

6    Jury instruction challenges are generally questions of state law. See Estelle v. McGuire,

7    502 U.S. 62, 71-72 (1991). In order to merit federal habeas relief petitioner must establish that

8    "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates

9    due process.'" Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

10   The challenged instruction cannot merely be "undesirable, erroneous, or even 'universally

11   condemned.'" Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "[T]he defendant must

12   show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the

13   jury applied the instruction in a way that relieved the State of its burden of proving every element

14   of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009).

15   The jury instruction "'may not be judged in artificial isolation,' but must be considered in the

16   context of instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp,

17   414 U.S. at 147); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam)

18   ("Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the

19   level of a due process violation"); Jones v. United States, 527 U.S. 373, 390-92 (1999).

20   On federal habeas review, this court applies the Brecht prejudice standard to determine

21   whether the challenged jury instruction had a "substantial and injurious effect or influence in

22   determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); see also

23   Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (in federal habeas cases the Brecht harmlessness

24   standard applies regardless of whether the state court performed harmless error analysis or what

25   standard it employed); Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (determining that

26   the Brecht harmless error standard applies on federal habeas).

27   ### 3. 2254(d) Analysis

28   For purposes of federal habeas review, this court is bound by the state court's

21

1    determination that lack of consent must be established before a defendant can be convicted of

2    human trafficking.  See ECF No. 18-22 at 46.  That determination of state law is binding on this

3    court.  See Powell v. Lambert, 357 F.3d 871, 874 (9th Cir. 2004) (citation omitted).  The counts

4    which petitioner challenges in this claim relate to victims C. and S.  See ECF No. 18-22 at 8, 14.

5    "If C. or S. freely and voluntarily consented to the confinement, Baldwin-Green did not

6    unlawfully deprive or violate their personal liberty."  ECF No. 18-22 at 47.  Since CALCRIM No.

7    1243 did not include a definition of consent, a threshold question for this court is whether its

8    absence had a "substantial and injurious effect or influence in determining the jury's verdict."[4]

9    Brecht, 507 U.S. at 637-38.  When the challenged instruction is viewed in the context of the

10   instructions as a whole, particularly the false imprisonment instruction in this case, it is not

11   reasonably likely that the jury applied the instruction in the unconstitutional manner that

12   petitioner suggests.  See Waddington, 555 U.S. at 190-91.  Based on the factual record in this

13   case, any error in failing to instruct the jury on the lack of consent required for human trafficking

14   would not have had a substantial and injurious effect or influence in determining the jury's verdict

15   for counts 13 and 26 because the jury also convicted petitioner of false imprisonment.  See ECF

16   No. 18-22 at 8, 14.  Moreover, the jury instruction on false imprisonment included lack of consent

17   as an element of the offense.[5]  Simply put, the jury rejected petitioner's defense that Victims C.

18   [4] "The defendant is charged in Counts 13 and 26 with human trafficking in violation of Penal
     Code section 236.l(b). To prove that the defendant is guilty of this crime, the People must prove
19   that: 1. The defendant either deprived another person of personal liberty or violated that other
     person's personal liberty; AND 2. When the defendant acted, he/she intended to commit or
20   maintain a felony violation of Penal Code sections 266i or 266h.  Depriving or violating another
     person's personal liberty, as used here, includes substantial and sustained restriction of another
21   person's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress,
     menace, or threat of unlawful injury to the victim or to another person under circumstances in
22   which the person receiving or perceiving the threat reasonably believes that it is likely that the
     person making the threat would carry it out." ECF No. 18-3 at 274.  The trial court subsequently
23   defined duress, violence, menace, and coercion.  Id.  The jury instruction concluded by stating:
     "[w]hen you decide whether the defendant used duress or coercion, or deprived another person of
24   personal liberty or violated that other person's personal liberty, consider all of the circumstances,
     including the age of the other person, her relationship to the defendant, and the other person's
25   handicap or disability." Id.
     [5] "The defendant is charged in Counts 9, 18 and 30 with false imprisonment by violence or
26   menace in violation of Penal Code sections 236/237(a). To prove that the defendant is guilty of
     this crime, the People must prove that: 1. The defendant intentionally and unlawfully restrained,
27   confined, or detained someone, or caused that person to be restrained, confined, or detained by
     violence or menace; AND 2. The defendant made the other person stay or go somewhere against
28   that person's will. Violence means using physical force that is greater than the force reasonably

                                                    22

1    and S. consented to the restrictions on their personal liberty.  Therefore, petitioner is not entitled

2    to relief on this claim.

3        **C.  Eighth Amendment Challenge to Sentence**

4        In his last claim for relief, petitioner contends that the trial court's imposition of

5    consecutive life terms violates the Eighth Amendment's cruel and unusual punishment clause

6    because it is grossly disproportionate to the crimes for which he was convicted.  Although

7    respondent argues that this claim is procedurally defaulted based on the failure to raise a

8    contemporaneous objection in the trial court, the undersigned elects to bypass this procedural

9    issue and resolve the claim on the merits.[6]  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997)

10   (stating that a federal habeas court may bypass a procedural default question and reach the merits

11   of a non-meritorious claim); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (same).

12       A review of the sentencing transcript indicates that the trial court imposed consecutive life

13   terms based on "the number of victims… whose lives he's impacted, what he's done to Tannisha

14   [sic] Williams, his lack of remorse, disregard for life, disregard for another human being's

15   dignity, only interested in his own personal gain.  There was overwhelming evidence of his

16   crimes."  ECF No. 18-12 at 470.  Petitioner's appellate counsel argued that the trial court

17   essentially double counted various elements of the offenses to justify imposing consecutive life

18   sentences.  See ECF No. 18-17 at 331 (Appellant's Opening Brief).  However, for purposes of

19   federal habeas relief, petitioner must demonstrate that his sentence was contrary to, or an

20   unreasonable application of, clearly established Eighth Amendment case law.  See 28 U.S.C. §

21   2254(d)(1).

22       The gross disproportionality principle embodied in the Eighth Amendment requires courts

23   to "objectively measure the severity of a defendant's sentence in light of the crimes he

24   _____

25   necessary to restrain someone. Menace means a verbal or physical threat of harm. The threat of
     harm may be express or implied. An act is done against a person's will if that person does not
26   consent to the act. In order to consent, a person must act freely and voluntarily and know the
     nature of the act."  ECF No. 18-3 at 267.
27   [6]  The California Court of Appeal declined to review this claim on the merits based on petitioner's
     failure to raise the issue before the trial court and his failure to adequately brief the claim on
     appeal.  See ECF No. 18-22 at 61.  Therefore, there is no reasoned state court opinion on this
28   claim.

23

1  committed." Norris v. Morgan, 622 F.3d 1276, 1287 (9th Cir. 2010). In this case, the trial court

2  weighed the severity of imposing consecutive indeterminate life sentences against the nature and

3  number of petitioner's crimes including the number of victims whose lives were permanently

4  impacted. Even assuming that consecutive indeterminate life sentences amounts to a sentence of

5  life without the possibility of parole, petitioner's crimes are not comparable to the minor felony

6  property crimes for which a life sentence violates the Eighth Amendment. See Solem v. Helm,

7  463 U.S. 277 (1983) (striking down a life without parole sentence for uttering a no account check

8  of $100); Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004) (concluding that defendant's 25 years-

9  to-life sentence under California's Three Strikes Law for a third shoplifting offense was grossly

10  disproportionate to the crimes committed). In this case, the gravity of petitioner's offenses is not

11  just measured in the number of victims, including minors, whom he preyed upon, but also his

12  repeated pattern of pimping and pandering young females in this case all while on probation for

13  committing prostitution in a different county. ECF No 18-12 at 464-65; see also Ewing, 538 U.S.

14  11, 25 (2003) (stating that "[r]ecidivism has long been recognized as a legitimate basis for

15  increased punishment.") (citations omitted). For all these reasons, there is no clearly established

16  federal law that permits this court to find that petitioner's consecutive life sentence violates the

17  Eighth Amendment. See Harmelin v. Michigan, 501 U.S. 957 (1991) (life sentence for adult for

18  one-time possession of cocaine did not violate Eighth Amendment); Norris, 622 F.3d at 1293

19  (emphasizing that "we are aware of no case in which a court has found a defendant's term-of-

20  years sentence for a non-homicide crime *against a person* to be grossly disproportionate to his or

21  her crime.") (emphasis in original). The undersigned recommends denying habeas relief on this

22  claim.

### IV.    Plain Language Summary for Party Proceeding Without a Lawyer

23

24  The following information is meant to explain this order in plain English and is not

25  intended as legal advice. The court has reviewed your habeas corpus petition and the trial court

26  record in your case. The undersigned is recommending that your habeas petition be denied on the

27  merits. If you disagree with this result, you have 21 days to explain why it is not correct. Label

28  your explanation "Objections to Magistrate Judge's Findings and Recommendations." The

1    district court judge assigned to your case will then review the entire record and make the final

2    decision.

3    　　　　Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

4    habeas corpus be denied.

5    　　　　These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty one days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

10   may address whether a certificate of appealability should issue in the event he files an appeal of

11   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

12   court must issue or deny a certificate of appealability when it enters a final order adverse to the

13   applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant

14   has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

15   Any response to the objections shall be served and filed within fourteen days after service of the

16   objections.  The parties are advised that failure to file objections within the specified time may

17   waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

18   1991).

19   DATED: September 23, 2025

20

21   _____

22   SEAN C. RIORDAN
     UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28